# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **:** |
| v. | **:** CRIMINAL CASE NO.: |
| CASSAUNDRA MCGHEE | **:** 1:16-cr-00015-25-AT-JSA |

### ORDER AND REPORT AND RECOMMENDATION

This case is before the undersigned on the motion of Defendant Cassaundra McGhee to Suppress Statements [360], which the Court **RECOMMENDS** be **DENIED**.

### I.   Background

This case is part of a large, multi-defendant action in which various inmates in and employees of certain Georgia state prisons, along with family members and other outside associates of inmates, allegedly conspired to smuggle contraband (including illegal cell phones) into the prisons.  Defendant McGhee is the mother of Co-Defendant Shameik Spinks, who was a prisoner at Autry State Prison during the relevant time.  *See* Transcript [554] at 16.

At the conclusion of the evidentiary hearing on September 23, 2016, the Court expressed certain preliminary findings of fact on the record.  *See id.* at 28-29.  Specifically, the Court preliminarily found that:

SO THE INTERVIEW OF THE DEFENDANT TOOK PLACE ON

DECEMBER 23RD OF 2015 AT HER PLACE OF WORK WHICH WAS A ZAXBY'S RESTAURANT. INITIALLY THE AGENTS, AGENT HOSTY AND HIS PARTNER AGENT DAVIS, WENT TO THE DEFENDANT'S HOME WHERE THEY SPOKE TO HER HUSBAND. HE'S THE ONE THAT INFORMED THEM THAT SHE WAS WORKING AT ZAXBY'S. SO THAT'S WHERE THEY WENT.

THEY INITIALLY SPOKE TO THE MANAGER ON DUTY AND REQUESTED THAT THEY SPEAK TO THE DEFENDANT. THE MANAGER THEN WENT AND RETRIEVED MS. MCGHEE, AND AGENT HOSTY TESTIFIES THAT HE REQUESTED OF MS. MCGHEE THAT THEY HAVE THE OPPORTUNITY TO SPEAK WITH HER, AND THEN THEY GO AND SPEAK WITH HER AT A BOOTH IN THE RESTAURANT.

AT THIS POINT ALL OR MOST OF THIS IS NOT RECORDED, SO THIS IS BASED ON THE TESTIMONY OF THE AGENT. THE RECORDING THEN COMES ON OR IS ABLE TO THEN HEAR THE CONVERSATION. THERE IS A DISPUTE AT FIRST IT SOUNDS AS TO WHETHER OR NOT THE MANAGER WILL BE PRESENT FOR THE INTERVIEW WHICH IS WHAT MS. MCGHEE WAS REQUESTING, AND THE AGENT AT FIRST WAS SAYING WE NEED TO SPEAK WITH HER ALONE, BUT THEN ULTIMATELY IT IS PERMITTED THAT THE MANAGER WHO WAS ALSO MS. MCGHEE'S COUSIN WOULD BE PERMITTED TO SIT WITH THEM IN THE BOOTH FOR PURPOSES OF THE INTERVIEW, AND SHE REMAINED FOR THE ENTIRE INTERVIEW.

THE AGENTS WERE DRESSED IN BUSINESS CASUAL ATTIRE INCLUDING JACKETS SINCE THIS WAS DECEMBER. THEY WERE ARMED, BUT THE WEAPONS WERE NOT DRAWN AND WERE CONCEALED UNDER THEIR CLOTHING.

THE AGENT TESTIFIED THERE WERE NO RAISED VOICES, OR I THINK IT'S BEST TO SAY EXPRESS THREATS OR PROMISES. OBVIOUSLY I'VE GOT TO LISTEN TO THE TAPE BECAUSE THINGS CAN BE THREATS OR PROMISES WITHOUT BEING EXPRESSED, BUT I'LL TAKE FROM THE TESTIMONY THERE

> WERE NO EXPRESS THREATS OR PROMISES. IT TOOK ABOUT 35 OR 38 MINUTES. THE DEFENDANT NEVER STOPPED OR REFUSED TO ANSWER QUESTIONS OR INDICATED SHE NEEDED A LAWYER.

*Id*. Neither party has objected to or pointed the Court to any evidence contradicting those preliminary findings of fact. Thus, the Court adopts and refers to these findings of fact.

At the hearing, an audio recording of the statements was offered into evidence and accepted as Exhibit 1. At the conclusion of the hearing, the Court set a deadline for the submission of a post-hearing brief by the Defendant, and the Court indicated that it would decide whether to order a responsive brief from the Government after receiving and reviewing the Defendant's brief, if any. Transcript [554] at 30. Because the parties chose to simply offer the recording into evidence, and not play any portion in open court, the Court ordered that the Defendant (and, if applicable, the Government) specifically point the Court to any parts of the recording on which the Court should focus. *Id.* The Defendant filed a post-hearing brief on November 1, 2016 [574]. Having reviewed that brief and having considering the recording and other evidence in the record, the undersigned has otherwise concluded that the adjudication of this motion does not require a Government response. Thus, the undersigned offers this Report and Recommendation based on the full factual record and the Defendant's legal

argument.

## II. Discussion

If a Defendant moves to suppress her incriminating statements to law enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily. *See Jackson v. Denno*, 378 U.S. 368 (1964). Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

Moreover, in *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Supreme Court also made clear that the Government has the burden to show the knowing and intelligent nature of a waiver. *See Miranda*, 384

U.S. at 475. Indeed, the Supreme Court made clear that "[if] the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*

The Supreme Court instructs us to look for two things in assessing this question:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

### A.   *Miranda*

It is undisputed that the agents did not advise Defendant of her *Miranda* rights prior to questioning her. The issue, however, is whether the Defendant was "in custody" during the interview such as to trigger her right to receive *Miranda* warnings. The Court finds that she was not.

The right to Miranda warnings attaches when custodial interrogation begins.

*United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). The Supreme Court in *Miranda* explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.  The Court subsequently defined "custody" in this context as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).  It is the Defendant's burden to demonstrate that he or she was in "custody" during questioning and that *Miranda* thereby even applies.  *See United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977)[1]; *see also United States v. Peck*, 17 F.Supp.3d 1345, 1353-55 (N.D.Ga. 2014) (Totenberg, J.)

The Supreme Court has more recently provided a non-exhaustive list of factors courts should consider in determining whether a suspect is in "custody" for purposes of *Miranda*:

> As used in our Miranda case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," Stansbury v. California, 511 U.S. 318, 322–[ ]23, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293[ ] (1994) (per

---

[1] The Eleventh Circuit has adopted as binding precedent all published decisions rendered by the U.S. Court of Appeals for the Fifth Circuit prior to September 30, 1981.  *See Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

curiam), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." Stansbury, supra, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, see [Maryland v.] Shatzer, [559 U.S. 98, 110–17], 130 S.Ct. [1213], 1223–[ ]26, 175 L.Ed.2d 1045 [ (2012) ], its duration, see Berkemer v. McCarty, 468 U.S. 420, 437–[ ]38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, see [Oregon v.] Mathiason, [429 U.S. 492], 495, 97 S.Ct. 711, 50 L.Ed.2d 714 [ (1977) ]; Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); Stansbury, supra, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, see New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see California v. Beheler, 463 U.S. 1121, 1122–[ ]23, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).
Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of Miranda. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, Berkemer, supra, at 437, 104 S.Ct. 3138, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. "Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Shatzer, 559 U.S. at ——, 130 S.Ct. at 1224.

*Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 1189–90, 182 L.Ed.2d 17 (2012);

*see also United States v. Luna–Encinas*, 603 F.3d 876, 881 (11th Cir. 2010)

(explaining that "although a reasonable person in the defendant's position may feel

constrained not to leave the scene of a police encounter at a particular

moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes.... Rather, 'a free-to-leave inquiry reveals only whether the person questioned was seized.' ... While 'seizure is a necessary prerequisite to Miranda, ... a court must [also] ask whether ... a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.' ") (citations omitted).

On this record, Defendant falls well short of showing, objectively, that her freedom was "curtailed to a degree associated with formal arrest." *Id*. Defendant was not arrested, handcuffed, detained, pulled over, or otherwise seized. Defendant, rather, was approached at a location familiar to her–the restaurant in which she worked– and interviewed at a table in the middle of that restaurant. Agent Hosty testified, without contradiction from any other witness, that he asked Defendant whether she would agree to talk with them, and she agreed. Tr. [554] at 25-26.[2] She requested that her cousin, a co-worker, be allowed to sit with her

---

[2] The initial interaction with the Defendant is not audible on the recording. The recorder had been turned on, but was held by Agent Hosty's partner, Agent Davis. Therefore, according to Agent Hosty, the recorder appears to have not audibly recorded the initial conversations between Agent Hosty and the Defendant and her manager at the restaurant counter. *See* Tr. [554] ("You just hear a lot of restaurant background noise, but by the time we make it to the table, you hear me explain what the interview is going to be about, and you hear Ms. McGhee talk about wanting to have her cousin sit with her or the manager sit with her.")

during the interview.  Although the agents initially stated that they would need to talk with the Defendant alone, they expressed this in a non-coercive manner and explained that it was for Defendant's own interest.  Specifically, as Agent Hosty testified, and as the recording of the interview shows, the agents suggested that they might need to ask Defendant awkward or embarrassing questions, that the Defendant might feel uncomfortable answering truthfully in front of co-workers, and that any affirmative dishonesty could subject her to penalties.  Ultimately, however, the agents agreed to allow Defendant's cousin (who was also her manager) to sit with her and be present for the entire interview, as the Defendant specifically requested.  *Id*. at 5.  The agents were dressed casually, without visible weapons, and left after about a thirty minute interview.

Defendant argues that she "could not simply leave without the possibility of getting fired or in trouble with her employer." Tr. [574] at 7.  This is a non-sequitur, however, because Defendant could have terminated the interview without necessarily storming out of the restaurant.  After all, nothing about Defendant's work obligations required her to sit with the agents and agree to an interview, or at least no evidence was introduced to that effect.  The Defendant points out that the agents never specifically advised her that she was free to leave or free to decline to answer questions.  But while such advisements would have been helpful, there is no specific "talismanic" test or incantation necessary.  *See Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 224 (1973).  The question is whether a reasonable person would believe that they were under arrest or subject to an equivalent restriction on movement.  In these circumstances, including where Plaintiff was interviewed in a public restaurant on terms that she herself successfully negotiated (i.e., having her cousin present), she does not sustain her burden on this question.  The Court therefore finds that Defendant was not "in custody," and that the agents were not obliged to furnish *Miranda* warnings.

      B.      **Voluntariness**

Regardless of whether Defendant was in custody, the Government bears the burden to show that Defendant made statements voluntarily.  That Defendant was not in custody during the interview is relevant to this inquiry, but is not dispositive, because the police can exact an involuntary confession even from a suspect not in custody.

The primary focus of the voluntariness inquiry is whether there has been police overreaching. *United States v. Bernal–Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics." *Id.* Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures

and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir.1985) (citation and quotations omitted). Among the non-exclusive factors to consider are the Defendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether Defendant was advised of his constitutional rights. *Id.*

In weighing all of the facts and circumstances, the undersigned finds in the Government's favor. The recording reflects that the tone of this interview was polite and cordial and that the agents did not raise their voices. As noted above, the agent testified without contradiction that they were dressed casually without visible weapons. Perhaps most significantly, the interview took place in a public place familiar to the Defendant, on terms that she successfully negotiated. Although the agents did not wish to do so, they ultimately agreed to the Defendant's request to speak only in the presence of her cousin and manager. As Agent Hosty appeared to say on the recording, "its fine, as long as you feel comfortable talking with us . . . ." *See* Ex. 1 (recording) at approximately 4:30. It is difficult to discern the sort of police overreaching suggestive of involuntariness in a public interview, lasting only 30 minutes, that begins with the assurance "as long as you feel comfortable talking with us," and in which the Defendant asks and is permitted to have her cousin sit by her side throughout.

Defendant points to the agent's statement that "every lie you tell us is a

felony charge." Def. Br. [574] at 9.  Agent Hosty's testimony, and the recording itself, explains the context of this statement.  Agent Hosty made this statement in the context of explaining to the Defendant why she may not wish to speak in front of her manager and cousin.  Specifically, Agent Hosty explained that some of the subject matter of the questioning may be embarrassing or awkward, so that a temptation may exist not to give truthful answers simply to avoid embarrassment, which would be problematic because "every lie you tell us is a felony charge."  *See* Ex. 1 (recording) at approximately 4:40.  In other words, "I just don't want to ask you something that you feel uncomfortable about and you answer a different way because she is sitting here as opposed to if you were sitting by yourself." *Id.* at approximately 4:40-4:55.  But the bottom line, as explained by the Agent, was that "its fine" to go about the interview in the way requested by Defendant, "as long as you feel comfortable talking with us," which apparently the Defendant indicated she did.  *See* Ex. 1 (recording) at approximately 4:30.  This exchange is entirely appropriate and supports a finding of voluntariness.

Defendant also states that "[t]he pressure of being at work and not wanting to cause a scene or appear uncooperative, compounded with a severe lack of information about why the agents were there, coerced Ms. McGhee to speak with the government." Def. Br. [574] at 9-10.  These are simply not the inferences that the Court reaches from the factual record.  It was the Defendant, not the agents,

who affirmatively brought her manager into the interview, which if anything caused more of a "scene," as this provoked an extended discussion with the agents about this unusual request. The agents, in other words, offered more discrete circumstances for this interview than what Plaintiff herself ultimately chose. Had Defendant agreed to sit with the agents in private, and quietly decline to answer any of their questions, there is no indication that this would have caused a "scene," or that her employer would have had any reason to believe she was being "uncooperative." The circumstances here suffice to establish voluntariness. *See, e.g., United States v. Emanuel*, 440 Fed.Appx. 881, 884-85 (11th Cir. Sept. 21, 2011) (finding that the prosecution proved defendant's voluntary consent to search, where "Emanuel invited the officers inside and cooperatively responded to their questions and requests. Emanuel was not threatened, coerced, restrained, handcuffed, patted down, required to answer questions, physically intimidated, or promised leniency. Although the officers were armed, they never removed their weapons from the holsters. The overall tone of the interview was 'cordial,' 'conversational,' and 'very laid back.'"). Thus, Defendant's Motion to Suppress [360] should be **DENIED**.

## CONCLUSION

The undersigned **RECOMMENDS** that Defendant's Motion to Suppress Statements [360] be **DENIED**. Defendant's Motion to Sever Defendants [359] is

**DEFERRED** to the trial judge.

As there is nothing else before the undersigned relating to this Defendant, the Court **CERTIFIES** that this case is **READY FOR TRIAL**.

**IT IS SO ORDERED** this 10th day of November, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE